UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,       )
                                )  NO. CR-05-180-LRS-1
        Plaintiff,              )     CR-05-180-LRS-2
                                )     CR-05-180-LRS-6
                                )     CR-05-180-LRS-7
    v.                          )
                                )  **ORDER DENYING MOTIONS**
                                )  **TO SUPPRESS AND DISMISS**
DIXIE ELLEN RANDOCK,            )
STEVEN KARL RANDOCK, SR.,       )
HEIDI KAE LORHAN,               )
ROBERTA LYNN MARKISHTUM,        )
                                )
        Defendants.            )
_____ )

**BEFORE THE COURT** are the Defendants' Motion To Suppress

Evidence (Ct. Rec. 328) and the Defendants' Motion To Dismiss Indictment, Or

Alternatively, Suppress Evidence (Ct. Rec. 342).

On October 15-18 and November 13-16, 2007, an evidentiary hearing was

conducted on these motions in Spokane. Concluding oral arguments were heard in

Yakima on January 10, 2008. The court has considered the evidence presented

(testimony and exhibits) and the oral arguments in making these rulings.

**I.  BACKGROUND**

In January 2005, the United States Secret Service initiated an investigation

into a number of Internet-based virtual schools that were alleged to have

fraudulently sold high school and college degrees. A number of the schools were

**ORDER DENYING MOTIONS**
**TO SUPPRESS AND DISMISS -    1**

believed to be operating out of an office leased by Defendant Steven Karl Randock, Sr., located in the basement of a building, the Post Falls Professional Center, at 601 E. Seltice Way, Suite 8B, Post Falls, Idaho.

On March 24, 2005, John E. Neirinckx, II, an agent with the United States Secret Service, and other agents of the Secret Service, including Agent Greg Ross and Agent Kevin Miller, went to the Post Falls Professional Center. The basis for the Secret Service to suspect, prior to March 24, 2005, that the schools were operating out of this office is detailed in the March 29, 2005 "Affidavit of John E. Neirinckx, II," (Ex. 1 to Ct. Rec. 360 at pp. 3-20, Paragraphs 6-25) which was submitted in support of a search warrant issued on that date. In the information the Secret Service had obtained prior to March 24, 2005, "A+ Institute" and "AEIT" were business names that had come up repeatedly in connection with the office located at 601 E. Seltice Way, Suite 8B, Post Falls, Idaho.

According to Neirinckx in his affidavit (Paragraph 26):

> On 3/24/05, Your Affiant observed approximately 7 boxes in a hallway within the building located at 601 E. Seltice Way, Post Falls, ID. The aforementioned hallway is located adjacent to suite 8B, and shares a common wall with suite 8B. I noticed many of the boxes contained files and what appeared to be documents and other articles within those files. I also noticed that some of the files had information written on them to include: "AEIT" and "A+ Institute."

There was a door to this hallway off of what has been referred to as the "main hallway" in the basement of the Post Falls Professional Center. Located within the subject hallway on one side was a door leading to Suite 8B, and off to the other side, was another door leading to five individually locked storage units which businesses could rent for storage purposes.

On March 29, 2005, based on the information contained in the Neirinckx affidavit, District of Idaho U.S. Magistrate Judge Mikel H. Williams authorized a search of the hallway (Attachment A to Application And Affidavit For Search

**ORDER DENYING MOTIONS**
**TO SUPPRESS AND DISMISS -    2**

Warrant, Ex. 1 to Ct. Rec. 360 at p. 53) and seizure of various items contained in the boxes.[1]   The list of items to be seized included "[p]apers, documents, notes, financial and business records, 'diplomas,' school 'transcripts,' e-mail correspondence in written form, and computer disks, contained in approximately 7 boxes located in the above described hallway, which are related to "AEIT," "A+ Institute" and other businesses affiliated with Suite 8B."  (Attachment B to Application And Affidavit For Search Warrant, Ex. 1 to Ct. Rec. 360 at p. 54).

On March 29, the warrant was executed and the Secret Service seized 11 boxes of material located in the subject hallway.  ( Ex. 1 to Ct. Rec. 360 at p. 50). After seizing the boxes, Agent Neirinckx posted a handwritten note on the wall above the area in the hallway where the boxes had been seized.  This note stated that an "angry tenant" had taken the boxes to the county landfill.  The warrant was executed at approximately 5:15 p.m.  A copy of the warrant and receipt was subsequently served by Agent Neirinckx on Ray Guerra, the landlord of the Post Falls Professional Center, at Mr. Guerra's home.

Approximately eight weeks later, on May 26, 2005, Defendant Roberta Markishtum, who worked in Suite 8B of the Post Falls Professional Center, contacted the Post Falls Police Department and reported the boxes had been stolen.  Post Falls Police Officer Kristi Mattson interviewed Markishtum.  On May 27, Neirinckx spoke with Post Falls Police Detective Dave Beck who had been assigned to investigate the "theft" at Suite 8B.  Neirinckx informed Beck that the boxes stolen were likely the same boxes which had been seized by the Secret Service pursuant to the March 29 warrant.  Neirinckx requested Beck's assistance in confirming who owned the boxes and Beck agreed to the same.

---

[1] Although the Magistrate Judge dated the warrant "March 28," the court believes this was a mistake and there is nothing suggesting to the contrary.

**ORDER DENYING MOTIONS**
**TO SUPPRESS AND DISMISS -    3**

On May 31, 2005, Beck made contact with Defendants Steven Randock, Dixie Randock and Roberta Markishtum at Suite 8B.  Spokane Police Department Fraud Unit Detective Bryan Tafoya accompanied Beck.  Tafoya was part of the Secret Service task force, Operation Gold Seal, investigating the alleged "diploma mill" being operated by the Defendants.  Tafoya asked for blank copies of some of the business forms that AEIT (Advanced Education Institute Trust) routinely used so as to become familiar with the type of records that had been "stolen."  Dixie Randock and Roberta Markishtum provided Tafoya with copies of certain documents.  Beck expressed interest in collecting badges and seals and he was provided with some foil seals bearing the name "Association of International Educational Assessors" (AEIA).

On June 6, 2005, Tafoya and Beck returned to Suite 8B to re-interview Markishtum.  During this interview, Beck once again expressed interest in some seals he saw on Markishtum's work station.  Markishtum gave Beck two foil seals bearing the name "National Board Of Education" (NBOE).

On June 8, 2005, Tafoya interviewed Amy Hensley who also worked for AEIT and whom during the May 31 interview the Randocks identified as one of their employees.  The interview with Hensley did not occur at Suite 8B, however. It occurred at Hensley's new place of employment.

On August 10, 2005, the Secret Service obtained seven search warrants which were executed on August 11 at the following locations: 1) the residence of Dixie and Steven Randock in Colbert, Washington; 2) Heidi K. Lorhan's residence in Veradale, Washington; 3) Amy Hensley's residence in Spokane; 4) Richard J. Novak's residence in Peoria, Arizona; 5) Suite 8B in the Post Falls Professional Center; 6) 14525 North Newport Highway, Mead, Washington; and 7) Northwest Business Stamp located in Spokane.

///

**ORDER DENYING MOTIONS
TO SUPPRESS AND DISMISS -     4**

On October 5, 2005, a grand jury returned an Indictment against the Defendants.  All of the Defendants are charged in Count 1 with Conspiracy To Commit Mail Fraud and Wire Fraud in violation of 18 U.S.C. §§371, 1341, and 1343.  Defendant Dixie and Steven Randock are also charged in Count 2 with Conspiracy To Launder Monetary Instruments in violation of 18 U.S.C. §1956(h).

## II. DISCUSSION

### A.  March 24, 2005 "Search"

"A [Fourth Amendment] 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."  *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652 (1984).  A reasonable expectation of privacy in the area searched is required.  *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507 (1967).  A reasonable expectation of privacy exists if one has an actual, subjective expectation of privacy and if the expectation is one society is prepared to recognize as reasonable.  *Id.* at 361.  The expectation of privacy in a commercial area is lower than that in a residential area.  *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 474 (1998)("[p]roperty used for commercial purposes is treated differently for Fourth Amendment purposes than residential property"); *New York v. Burger*, 482 U.S. 691, 700, 107 S.Ct. 2636 (1987)("expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home").  It is the Defendants' burden to establish that under the totality of the circumstances, they had a legitimate expectation of privacy in the hallway in which the boxes were located.  *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556 (1980).

This court concludes that Defendants did not have a reasonable expectation of privacy in the subject hallway and hence, the discovery of the boxes on March 24, 2005 by Agent Neirinckx did not constitute a "search" for Fourth Amendment

**ORDER DENYING MOTIONS**
**TO SUPPRESS AND DISMISS -    5**

purposes.  Because there was no reasonable expectation of privacy in the area searched, none of the Defendants can claim the protection of the Fourth Amendment and therefore, none of them have standing to challenge the "search" that occurred on March 24, 2005.  *U.S. v. Paopao*, 469 F.3d 760, 764 (9th Cir. 2006).  "A privacy interest in the place or thing searched is always required in order for a defendant to challenge the search."  *Id*. at 765.

The preponderance of the evidence establishes that the door off the main hallway to the secondary hallway in which the boxes were located was not equipped with a lock and therefore, access to the secondary hallway by the public and other building tenants was not restricted.[2]  Defendants Markishtum and Hensley testified the door did have a lock at one period of time, and that the lock must have been subsequently removed.  They are not as credible as the witnesses who testified the door was not equipped with a lock.  In this regard, the court notes the conflicting statements Markishtum provided as to when she last saw the boxes in the hallway, as well as her admission to the use of aliases, and her admission that she falsely represented to the public that in her employment with OTAC (Official Transcript Archive Center), she was physically located in Delaware. Hensley has pled guilty to Count 1of the Indictment charging her with Conspiracy To Commit Wire Fraud and Mail Fraud.  Hensley acknowledged telling Safeco Special Investigator Traci Johnson in an interview on July 7, 2005 that "[A]s far as I know," there was a keyed entry from the outside of the door.  Hensley also admitted that as a result of coaching from Dixie Randock prior to the interview,

---

[2]  The burden of proof on the government in a suppression hearing is preponderance of the evidence since guilt or innocence is not being determined. *U.S. v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S.Ct. 988 (1974), citing *Lego v. Twomey*, 404 U.S. 477, 488-89, 92 S.Ct. 619 (1972).

**ORDER DENYING MOTIONS
TO SUPPRESS AND DISMISS -    6**

1  she was evasive with Johnson and indeed, told her several falsehoods.  Defendant

2  Steven Randock testified that in late July or early August 2004, he inspected Suite

3  8B and at that time, he looked inside the subject hallway "briefly" and noticed a

4  "twisty type" lock on the interior of the door leading into the main hallway.  He

5  acknowledges he spent only a total of roughly ten minutes inspecting Suite 8B

6  before subsequently signing a lease for Suite 8B.  Mr. Randock testified he

7  subsequently visited Suite 8B approximately five times prior to May 31, 2005, but

8  on those occasions he never looked inside the interior of the subject hallway.[3]

9      There were no signs on or around the door to the secondary hallway

10  indicating access by the public was restricted.  The Defendants did not exercise

11  control over access to the hallway. The hallway was a common area and did not

12  qualify as "business curtilage" of Suite 8B.  The hallway was not part of the leased

13  space of Suite 8B.  Furthermore, the court finds credible the testimony of Agent

14  Nierinckx that he found the hallway door partially open on March 24, 2005,[4]

15  although even had the door been closed, that would not have created a reasonable

16  expectation of privacy in a hallway area that was located behind an unlockable

17  door in a commercial building readily accessible to the public, as well as to other

18  tenants in the building.  It is noted that all of the Defendants who worked in Suite

19  8B and/or who had placed material in the hallway either knew or had reason to

20  know that other tenants in the building had ready access to the area, inasmuch as

21  miscellaneous furniture and other materials were stored therein.

22      Without a reasonable expectation of privacy in the hallway, the Defendants

23  did not have a reasonable expectation of privacy in the contents of the boxes,

24

25      [3] Defendant Dixie Randock testified that she had not visited Suite 8B prior

26  to the May 31, 2005 meeting with Detectives Beck and Tafoya.

27      [4] This testimony was corroborated by the testimony of Agent Greg Ross.

28

**ORDER DENYING MOTIONS
TO SUPPRESS AND DISMISS -    7**

particularly when the boxes were not clearly marked as belonging to the tenants of Suite 8B as their personal and business effects, and there were no lids on many of the boxes. The court, however, finds credible the testimony of the Secret Service agents that they did not examine the contents of the boxes in the hallway on March 24, 2005.[5]

Had the agents examined the contents, and assuming the Defendants had a reasonable expectation of privacy in the contents as their personal or business effects, a warrantless Fourth Amendment search of those contents would have been justified based on the "plain view" exception. The plain view exception requires that: (1) the initial intrusion must be lawful; and (2) the incriminatory nature of the evidence must be immediately apparent to the officer. *United States v. Garcia*, 205 F.3d 1182, 1187 (9th Cir.), *cert. denied*, 531 U.S. 856 (2000). See also *United States v. Bradley*, 321 F.3d 1212, 1214-15 (9th Cir. 2003)(observations of contraband inside residence when police executed warrantless entry to check on safety of nine-year old could be used to support search warrant application because items were in plain view). As there was no reasonable expectation of privacy in the hallway, the agents' "intrusion" into the hallway was lawful. Furthermore, the court finds credible the testimony of Agents Neirinckx and Ross that plainly visible to them in the boxes were files or folders with information written on the headings including "AEIT" and "A+ Institute." The incriminatory nature of this evidence would have been immediately apparent to the agents so as

---

[5] Defendants maintain there were lids on the boxes and that the agents must have gone through the boxes to know that computer disks were contained therein, items which in the March 29 application for a search warrant were specifically listed as items to be seized. Pictures taken on the scene clearly suggest that few, if any, of the boxes were secured with lids, and that files were placed in such a fashion that computer disks, as well as papers and records, would have easily been visible in at least some of the boxes even before they were moved.

**ORDER DENYING MOTIONS
TO SUPPRESS AND DISMISS -    8**

to justify further investigation of the contents of the boxes.

No Fourth Amendment "search" occurred on March 24, 2005. Alternatively, if any Fourth Amendment search did occur without a warrant, it was justified by the "plain view" exception. Accordingly, nothing which occurred on March 24, 2005 tainted the search warrant subsequently obtained on March 29.

### B.  The March 29, 2005 Search Warrant

### 1.  Omissions In The Affidavit

Defendants note that Agent Neirinckx's affidavit in support of this warrant did not mention there was any door to the hallway in which the boxes were discovered.  (Paragraph 26 to Neirinckx Affidavit, Ex. 1 to Ct. Rec. 360).

The court finds this was not an intentional or reckless omission.  Since Agent Neirinckx found the door partially open, the fact he did not mention the existence of the door is not particularly surprising and any significance of there being a door to the hallway was markedly diminished, if not eliminated.  Had Agent Neirinckx informed the Magistrate Judge of the partially open door, this court believes the Magistrate Judge would still have issued the warrant by finding that no reasonable expectation of privacy of the Defendants was infringed by the agents in their discovery of the boxes in the hallway, and that there was still probable cause to search the hallway and seize the boxes..

### 2.  Particularity Of The Warrant

Defendants note that Attachment A to the March 29, 2005 warrant stated the hallway to be searched was to the "West of suite 8B," when it was in fact to the north of Suite 8B.

There must be sufficient particularity in a warrant so as to give meaningful guidance to searching officers.  *United States v. Clark*, 31 F.3d 831, 836 (9th Cir.

**ORDER DENYING MOTIONS**
**TO SUPPRESS AND DISMISS -    9**

1994).  The purpose of the requirement is to prevent a "general, exploratory

rummaging."  *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022

(1971).

Agent Neirinckx testified that Attachment A mistakenly indicated the

hallway was to the "West of suite 8B."  Agent Neirinckx, however, knew exactly

where the hallway to be searched was located.  The mistake had no adverse impact

upon the Defendants.  The hallway to the "West of suite 8B" was the main

hallway.  Nothing belonging to the Defendants was located in that hallway which

the public used to access entrances to the various businesses located on the

basement floor of this commercial building.  Additionally, the area to be searched

was, in effect, an extension of the main hallway and adjacent thereto.  Any error in

the use of the term "West" rather than "North" could not have misled the

Magistrate Judge issuing the search warrant in light of all the detailed information

provided concerning the actual area to be searched.

### 3.  Execution Of Warrant

In 2005, Fed. R. Crim. P. 41(f)(3) provided that:

> The officer executing the warrant must: (A) give a copy of
> the warrant and a receipt for the property taken to the person
> from whom, or from whose premises, the property was taken;
> or (B) leave a copy of the warrant and receipt at the place
> where the officer took the property.

Agent Neirinckx served the warrant and the receipt on Ray Guerra, the

landlord of the Post Falls Professional Center.  The search was not executed until

5:15 p.m., after the normal close of business for most offices.  Defendants contend

Agent Neirinckx acted with intentional and deliberate disregard of Rule 41(f)(3)

and that this is a violation of the Fourth Amendment because a copy of the search

warrant was served on the landlord who did not own any of the property that was

taken, and the agent knew well whose property was taken.

**ORDER DENYING MOTIONS
TO SUPPRESS AND DISMISS -    10**

1   The policies underlying the warrant requirement include "providing the

2   property owner assurance of the lawful authority of the executing officer, his need

3   to search, and the limits of his power to search." *United States v. Celestine*, 324

4   F.3d 1095, 1100-01 (9th Cir. 2003). "[A]bsent exigent circumstances, if a person is

5   present at the search of her premises, [Rule 41(f)] requires officers to give her a

6   complete copy of the warrant at the outset of the search." *United States v. Gantt*,

7   194 F.3d 987, 1005 (9th Cir. 1999).

8   In the case at bar, there was no violation of Rule 41(f)(3). Copies of the

9   warrant and receipt were served on Ray Guerra, "the person . . . from whose

10  premises[] the property was taken." The boxes were not located in Suite 8B, but

11  in a common public hallway in the Post Falls Professional Center. Defendants

12  leased Suite 8B. They did not lease the hallway and so the hallway does not

13  qualify as their "premises." A plain reading of Rule 41(f)(3) does not, by its

14  terms, require the warrant and receipt to have been served on the tenant of Suite

15  8B or an employee who worked there. The court has no authority to add such a

16  provision under the guise of legal interpretation, particularly in the absence of any

17  case law to the contrary. Moreover, a finding that there is no Rule 41(f)(3)

18  violation is  consistent with the finding that Defendants had no reasonable

19  expectation of privacy in the hallway.[6]

20

21  **4.  Inventory Requirements**

22  In 2005, Fed. R. Crim. P. 41(f)(2) provided:

23  _____

24  [6] Likewise, the fact Defendants had no reasonable expectation of privacy in

25  the hallway renders insignificant the fact the warrant was executed after the close

26  of business. There is some question whether Guerra was served with Attachment

27  A and Attachment B to the warrant. Guerra, however, is the only one who would

    have standing to assert any such deficiency.

28

**ORDER DENYING MOTIONS
TO SUPPRESS AND DISMISS -    11**

An officer present during the execution of the warrant must prepare and verify an inventory of any property seized. The officer must do so in the presence of another officer and the person from whom, or from whose premises, the property was taken. If either one is not present, the officer must prepare and verify the inventory in the presence of at least one other credible person.

The record indicates that Agent Greg Ross, who was not present during the execution of the warrant on March 29, verified on April 22, 2005, an inventory of the items seized. (Ex. 1 to Ct. Rec. 360 at Bates p. 50).[7] To the extent there was any violation of Rule 41(f)(2), however, it does not require suppression of the items seized.

Suppression is "rarely the proper remedy for a Rule 41 violation." *U.S. v. Williamson*, 439 F.3d 1125, 1132 (9th Cir. 2006), quoting *United States v. Calandra*, 414 U.S. 338, 348 n. 6, 94 S.Ct. 613 (1974)(Federal Rules of Criminal Procedure do "not constitute a statutory expansion of the exclusionary rule"). "Only a 'fundamental violation of Rule 41 requires automatic suppression, and a violation is 'fundamental' only where it, in effect, renders the search unconstitutional under traditional fourth amendment standards." *United States v. Johnson*, 660 F.2d 749, 753 (9th Cir. 1981). There are three circumstances under which evidence obtained in violation of Fed. R. Crim. P. 41 requires suppression: (1) the violation rises to a "constitutional magnitude;" (2) the defendant was prejudiced, in the sense that the search would not have occurred or would not have been so abrasive if law enforcement had followed the Rule; or (3) officers acted in "intentional and deliberate disregard" of a provision in the Rule. *Williamson*, 439

---

[7] The "inventory" is distinguishable from the "receipt" that was served on Mr. Guerra on March 29. What Ross signed is titled a "Certification" and it was signed and subscribed before District of Idaho Magistrate Judge Larry M. Boyle on April 22, 2005.

**ORDER DENYING MOTIONS TO SUPPRESS AND DISMISS -    12**

F.3d at 1133.[8]

Any violation of Rule 41(f)(2) in the case at bar did not render the March 29 search unconstitutional. The inventory occurred subsequent to the search. Defendants were not prejudiced as the search would have occurred in any event, and the manner in which the inventory was prepared and verified had no bearing on the manner in which the search was conducted. *See United States v. Dudek*, 530 F.2d 684, 688 (6th Cir. 1976) ("[F]ailure to follow the requirements of Rule 41 of the Federal Rules of Criminal Procedure pertaining to inventory of objects seized and prompt return to the court has been held not to require invalidation of an otherwise properly issued and executed search warrant or the suppression of evidence acquired under it"). Finally, even if any violation of Rule 41(f)(2) was intentional, the court was not presented with evidence indicating that any violation was committed deliberately so as to result in some type of prejudice to the Defendants.

### C. Alleged "Outrageous" Conduct

Defendants contend the note left by Agent Neirinckx indicating the boxes had been taken by an "angry tenant" and could be found at the landfill had the desired effect of causing Defendants to contact law enforcement about a "theft" which, in turn, provided law enforcement with an opportunity to gain access to Suite 8B. Defendants contend Detectives Beck and Tafoya intentionally and deliberately misrepresented their true purpose in contacting the Defendants which was to investigate the alleged "diploma mill" being operated out of Suite 8B.

At the outset, the court finds the preponderance of the evidence indicates

---

[8] *Williamson* did not involve any of Rule 41's inventory requirements. The challenge there pertained to the failure of searching officers to present a complete copy of the warrant at the outset of the search.

**ORDER DENYING MOTIONS
TO SUPPRESS AND DISMISS -    13**

the overwhelming primary purpose of the aforementioned ruse was to assist the Operation Gold Seal task force with their investigation of what it believed was a "diploma mill" being operated out of Suite 8B. Suspected insurance fraud on the part of the Defendants was, at best, a very minor and secondary consideration.

In order to warrant dismissal on due process grounds, government misconduct must be "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. King*, 200 F.3d 107, 1213 (9th Cir. 1999). A defendant "must prove that the government's conduct was 'so excessive, flagrant, scandalous, intolerable, and offensive as to violate due process." *United States v. Edmonds*, 103 F.3d 822, 825 (9th Cir. 1996), quoting *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993), *cert. denied*, 510 U.S. 1058 (1994). The Ninth Circuit has found outrageous government conduct in instances where the government has engineered and directed the criminal enterprise from start to finish and where the police have been brutal, employing physical or psychological coercion against a defendant. *U.S. v. Fernandez*, 388 F.3d 1199, 1238 (9th Cir. 2004). The Ninth Circuit has identified two remedies: 1) dismissal of the indictment, which is drastic, disfavored, and thus used only in the most egregious cases; or 2) suppression at trial of evidence improperly obtained. *United States v. Haynes*, 216 F.3d 789, 796 (9th Cir. 2000), *cert. denied*, 531 U.S. 1078 (2001).

The government and the Defendants have cited various cases for their respective positions, but to no great surprise, none of those cases present the unique factual circumstances present in the case at bar. In *United States v. Bosse*, 898 F.2d 113 (9th Cir. 1990), the defendant was a licensed semiautomatic firearms dealer and had an application pending for a state license to buy and sell automatic machine guns. An agent of the California Department of Justice inspected the defendant's home and surrounding premises with defendant's consent as part of

**ORDER DENYING MOTIONS
TO SUPPRESS AND DISMISS -    14**

the license application process.  A federal Alcohol, Tobacco and Firearms (ATF)
agent accompanied the state inspector on the search without identifying himself as
an ATF agent.  Subsequently, the ATF sought and obtained a search warrant for
the defendant's home.

It was undisputed that the ATF Agent had accompanied the state inspector
not for the purpose of assisting the inspector , but rather to further the ATF agent's
investigation into possible federal firearms violations.  The ATF agent testified he
accompanied the state inspector in his capacity as a federal agent and prepared
diagrams of the layout of the defendant's house in preparation for obtaining and
executing a search warrant.  The state inspector identified himself to the defendant
as a state agent conducting an inspection in connection with the defendant's
pending license application and explained that the ATF agent "is with me."  The
Ninth Circuit Court of Appeals found that in these circumstances, the ATF agent's
silence amounted to a deliberate misrepresentation that his purpose was that
announced by the state inspector, and therefore a deliberate misrepresentation of
his true purpose.  The circuit held the ATF agent's surreptitious entry into the
home was illegal.  *Id*. at 115.

One of the cases cited in the *Bosse* decision was *United States v. Phillips*,
497 F.2d 1131 (9th Cir. 1974).  In *Phillips*, a federal agent, in order to gain entry
into the defendant's office building, asked Santa Monica police officers for help.
Under the direction of the federal agent, the uniformed officers knocked on the
door and asked permission to enter to investigate a report of burglary in the
building.  There was no such report, however, as it had been invented by the
federal agent.  After some delay, the door was opened by an occupant and the
uniformed policemen entered, followed immediately by undercover narcotics
agents, who had emerged from hiding.  The occupants of the building were led to
believe they were admitting officers to investigate a burglary when, in fact, the

**ORDER DENYING MOTIONS
TO SUPPRESS AND DISMISS -    15**

1    officers and agents were entering to arrest the defendant.

2         The Ninth Circuit held the entry and the subsequent arrest of the defendant

3    (Phillips) were invalid because the agents did not have probable cause to believe

4    the defendant was in his office at the time of the raid. *Id*. at 1136. "An agent must

5    have probable cause to believe that the person he is attempting to arrest, with or

6    without a warrant, is in a particular building at the time in question before that

7    agent can legitimately enter the building by ruse or any other means." *Id*.

8         Recently, *Bosse* was cited in *U.S. v. Alverez-Tejeda*, 491 F.3d 1013 (9th Cir.

9    2007), a case in which federal Drug Enforcement Agents employed an elaborate

10   ruse to seize an automobile.  It was undisputed that the DEA agents had the right

11   to seize the car without a warrant.  The agents had probable cause to believe the

12   car had been used for carrying contraband because they had purchased drugs from

13   inside it as part of their investigation.  They also had probable cause to believe the

14   car was carrying contraband on the day of the seizure based on several intercepted

15   phone calls and direct surveillance.  The only issue was the unorthodox method of

16   seizing the car.  With regard to that method, the Ninth Circuit Court of Appeals

17   held:

18              Nor was there anything unreasonable in the agents' choice
               of guile to seize the car, rather than taking it outright, as
19              they were entitled to do.  While we don't generally second-
               guess the government's use of stealth to ferret out criminal
20              activity . . . we take a closer look when agents identify
               themselves as government officials but mislead suspects as
21              to their purpose and authority.  This because people "should
               be able to rely on [the] representations of government
22              officials.  *United States v. Bosse*, 898 F.2d 113, 115 (9th
               Cir. 1990)(per curiam)(internal quotation marks omitted).
23              If people can't trust the representations of the government
               officials, the phrase "I'm from the government and I'm
24              here to help" will become even more terrifying.

25              This concern is at its zenith when government officials
               lie in order to gain access to places and things they
26              would otherwise have no legal authority to reach. . . .
               This consideration is not implicated by the agents'
27              actions here because they already had the authority

28

**ORDER DENYING MOTIONS
TO SUPPRESS AND DISMISS -    16**

to seize the car and arrest Alverez-Tejeda; their lies didn't have the effect of expanding their ostensible authority beyond the scope of their actual authority. The only consequence of their deceit was to treat Alverez-Tejeda as a victim, rather than a criminal suspect-driving him to a hotel rather than immediately dragging him off to jail- and the only harm he suffered was being misled and subjected to the fright that comes from being a crime victim. We find the agents' actions in misleading Alverez-Tejeda were reasonable in light of their vital interest in seizing the drugs and not exposing their investigation.

*Id*. at 1017.

While the Ninth Circuit Court of Appeals "take[s] a closer look when agents identify themselves as government officials but mislead suspects as to their purpose and authority," there is no rule that whenever agents engage in this kind of activity it is *per se* unconstitutional and illegal. So too, this court has taken a closer look to determine whether the ruse perpetrated in the case at bar constitutes "outrageous" conduct.

Conflicting testimony was offered at the evidentiary hearing as to whether Detective Tafoya identified himself as a member of the Post Falls Police Department when he in fact is a Spokane police officer who had been assigned to the Operation Gold Seal task force to assist in the "diploma mill" investigation. Defendants testified that Tafoya identified himself as a Post Falls police officer during their contact with him on May 31, 2005. Tafoya testified that he said nothing about the nature of his official position and that the Defendants never asked him about it.[9] Certainly, under the circumstances it would have been reasonable for the Defendants to assume Tafoya was with the Post Falls Police Department since the Defendants had reported the "theft" to the Post Falls Police Department and Tafoya was accompanied by Detective Beck who did identify

---

[9] Detective Beck corroborated Tafoya's testimony on this point and also testified that he did not recall specifically identifying Tafoya as his partner.

**ORDER DENYING MOTIONS TO SUPPRESS AND DISMISS - 17**

himself as a Post Falls police officer and left a business card with the Defendants confirming the same.  There is no doubt Tafoya hoped the Defendants would assume he was a member of the Post Falls Police Department.  The court finds credible Tafoya's testimony that he did not say anything to the Defendants about the nature of his official position and that he was not asked about it by the Defendants.[10]  The court also finds that this does not rise to the level of the "affirmative or deliberate" misrepresentation at issue in *Bosse* where the state inspector specifically advised the defendant that the ATF agent "is with me."[11]  Furthermore, in *Bosse*, the state inspector was truly conducting a state inspection

---

[10]  The Defendants who testified at the hearing are not credible on this factual matter.  See pp. 6-7 *supra*.

[11] Nor does it rise to the level of the affirmative misrepresentation at issue in *United States v. Stringer*, 408 F.Supp.2d 1083 (D. Or. 2006).  In *Stringer*, a district court dismissed indictments, and alternatively ordered evidence suppressed, where it found egregious government misconduct in concealing in a civil securities investigative proceedings the fact that criminal prosecutions were already contemplated and for which the civil proceedings were being used to gather evidence.  In response to direct questions by defendant's attorney, a Securities Exchange Commission (SEC) attorney affirmatively misrepresented that the defendant Stringer was not the "target" of any investigation and that the SEC was not working in conjunction with the U.S. Attorney's Office regarding a possible criminal investigation.  *Id*. at 1087-89, citing among other cases, *United States v. Tweel*, 550 F.2d 297, 300 (5th Cir. 1977).  The court noted it is a due process violation if government agents make affirmative misrepresentations as to the nature or existence of parallel proceedings and that a government agency may not develop a criminal investigation under the auspices of a civil investigation. Because the defendants were identified as subjects of a criminal investigation, the government's tactic to move forward under the guise of a civil investigation violated defendants' due process rights.  *Id*. at 1089, citing *United States v. Robson*, 477 F.2d 13, 18 (9th Cir. 1973).

**ORDER DENYING MOTIONS**
**TO SUPPRESS AND DISMISS -    18**

and the ATF agent used that as a reason to gain entry into the defendant's home, whereas in the case at bar, both Beck (the Post Falls police officer) and Tafoya (the federal task force officer) went to Suite 8B for the ostensible purpose of investigating a "theft," although they both knew it was likely that the boxes in question were those that had been taken by the Secret Service on March 29.[12]

That, however, is not the end of the inquiry, nor the most important component of the due process analysis. There is no discussion in *Bosse* whether the ATF agent already had probable cause to enter and search the defendant's home before he entered the home with the assistance of the state inspector. It appears the ATF agent did not have such probable cause ("Rusin accompanied Dunkin not for the purpose of assisting in the state licensing inspection, but rather to further Rusin's investigation into **possible** federal firearms violations"). *Bosse*, 898 F.2d at 115(emphasis added). The ATF agent testified he wanted to gain entry to gather information to assist him in obtaining a search warrant. In other words, probable cause had not yet been established. A search warrant was subsequently issued and it was during that search that a sawed-off shotgun was discovered in the home that led to the federal firearm charge against the defendant. The Ninth Circuit noted the fact the ATF agent's prior entry into the home with the state inspector was illegal did not end the inquiry because it needed to be determined whether the illegal entry tainted the warrant and the probable cause supporting the warrant. In other words, if the warrant- the probable cause- arose from a source entirely independent of the illegal search, suppression of the shotgun was not necessary. The circuit remanded the case to the district court for

---

[12] Because Markishtum had reported to Officer Mattson that eight boxes were missing and that she had last seen them on May 12, 2005, there was not absolute certainty by Beck and Tafoya that these were the same boxes (totaling 11 in number) as those seized by the Secret Service on March 29, 2005.

**ORDER DENYING MOTIONS**
**TO SUPPRESS AND DISMISS -    19**

1    that determination.  *Id*. at 116.

2         In *Phillips*, what was critical was that the federal agents did not have

3    probable cause to believe the defendant was in the office building at the time of

4    the entry that was gained by means of a ruse, that being the fictitious burglary

5    report.[13]  Likewise, in *Alverez-Tejeda*, what was critical was the agents already had

6    probable cause to believe the car had been used for carrying contraband prior to its

7    seizure by means of a ruse, and had probable cause to believe the car was carrying

8    contraband on the day of that seizure.

9         Agent Neirinckx obtained a search warrant authorizing seizure of the boxes

10   in the common public hallway located adjacent to Suite 8B.  The Neirinckx search

11   warrant affidavit established probable cause that there was illegal "diploma mill"

12   activity occurring in Suite 8B which justified seizure of boxes found in a hallway

13   adjacent to Suite 8B.  (Neirinckx Affidavit at Paragraphs 6-25, Ex. 1 to Ct. Rec.

14   360).   These boxes contained files which, in "plain view," had written

15   labels/markings identifying businesses the Secret Service had probable cause to

16   believe were associated with Suite 8B.  The Secret Service already had probable

17   cause to obtain a search warrant for the interior of Suite 8B at the time it sought a

18   search warrant for the adjacent hallway authorizing seizure of the boxes.  The

19   information contained in the boxes strengthened probable cause for the issuance of

20   ///

21   ///

22   ///

23   ————————————————

24        [13]  In *Phillips*, the federal agents made up the burglary report on the spot and

25   there was in fact never any such report.  In the case at bar, there was an actual

26   "theft" report filed by the Defendants with the Post Falls Police Department, albeit

27   a report that was precipitated by the deception of the Secret Service in leaving a

     note that stated the boxes had been taken to the landfill by an "angry tenant."

28

     **ORDER DENYING MOTIONS**
     **TO SUPPRESS AND DISMISS -    20**

a search warrant for the interior of Suite 8B.[14]  The Secret Service chose not to obtain a search warrant for the interior of Suite 8B prior to the discovery of the boxes or immediately after the discovery.  This court finds, and the record bears out, there was a legitimate reason for this.  The Secret Service wanted to maintain a covert investigation of the alleged "diploma mill" activity to further reveal the alleged criminal design and conspiracy of the Defendants.  As in *Alverez-Tejeda*, the Secret Service did not want to expose its investigation too early and certainly, that would have occurred had a warrant been obtained and a search of Suite 8B executed in March or May of 2005.  Although by March 24, 2005, the Secret Service already had a reasonable suspicion that the Defendants were involved in "diploma mill" activity originating out of Suite 8B[15], the Secret Service still needed to determine the precise roles of the Defendants in this activity, as well as how the various businesses thought to be operating out of Suite 8B were related.  Moreover, this was a far-ranging and extensive investigation involving numerous

---

[14]  There was testimony that examination of the contents of the boxes by the Operation Gold Seal task force occurred soon after seizure of the boxes.  The "inventory" was certified by Agent Ross on April 22, 2005, over a month before Beck and Tafoya visited Suite 8B.  Information derived from the contents of the boxes was used in procuring the warrants that were issued on August 10, 2005.  (Ex. 5 to Ct. Rec. 361 at Paragraphs 110-112; Ex. 7 to Ct. Rec. 361 at Paragraphs 104-106; and Ex. 8 to Ct. Rec. 361 at Paragraphs 110-112).

[15]  See Paragraph 5 of March 29, 2005Affidavit of Nierinckx (Ex. 1 to Ct. Rec. 360 at p. 29), indicating that in January 2005, based on information obtained from an investigator with the Washington State Attorney General's Office, the Secret Service commenced its investigation into a number of internet based virtual "schools" selling fraudulent degrees.  The investigator from the state attorney general's office advised that Dixie Randock, Steven Randock, Heidi Lorhan, Amy Hensley, and Robert Markishtum were among the "main suspects" believed to be operating the schools.

**ORDER DENYING MOTIONS**
**TO SUPPRESS AND DISMISS -    21**

individuals (suspects and non-suspects) in multiple locations in addition to Suite 8B (as borne out by the multiple search warrants executed on August 11, 2005). Indeed, the investigation ultimately led to the foreign nation of Liberia which had suspected involvement in the alleged accreditation of internet schools being operated by the Randocks. A search of the interior of Suite 8B in March or May 2005 pursuant to a warrant would likely have brought the investigation to a close. Accordingly, the Secret Service resorted to deception to further its investigation of what was actually going on in Suite 8B.

The court finds the government did not act unreasonably in choosing to resort to this deception because it already had probable cause to search the interior of Suite 8B. The deception did not have the effect of expanding its ostensible authority beyond the scope of its actual authority. As in *Alverez-Tejeda*, the consequence of the deceit was to treat the Defendants as victims of a crime rather than as criminal suspects. Also of significance is that the Defendants initiated the contact with law enforcement by reporting the "theft" and inviting law enforcement to undertake an investigation of the "theft." The Defendants were not coerced into reporting the "theft" to law enforcement. They could have chosen not to file a report. Defendants may argue they were effectively coerced into reporting the "theft" because of sensitive customer information contained in the boxes (i.e., credit card information), and that is indeed a legitimate reason to report a "theft." These Defendants, however, whom law enforcement already had reasonable suspicion to believe were involved in defrauding their customers, were not entitled to blithely assume they could ask law enforcement officers to investigate the "theft" without their suspected fraudulent activity being investigated by those same officers. In these particular circumstances, the Defendants were not entitled

///

///

**ORDER DENYING MOTIONS
TO SUPPRESS AND DISMISS -    22**

to assume that few, if any, questions would be asked and that there would be no potential adverse consequences for them.[16]

The benchmark for the Fourth Amendment is reasonableness, which requires weighing the government's justification for its actions against the intrusion into the defendant's interests. *Alverez-Tejeda*, 491 F.3d at 1016. "Artifice and stratagem may be employed to catch those in criminal enterprises[;] . . . to reveal the criminal design; [or] to expose the illicit traffic, . . . the illegal conspiracy, or other offenses." *Lewis v. United States*, 385 U.S. 206, 209 n. 5, 87 S.Ct. 424 (1966), quoting *Sorrells v. United States*, 287 U.S. 435, 441-42, 53 S.Ct. 210 (1932). Here, the government had a legitimate justification for it deception, that being the preservation of the anonymity of its ongoing investigation. This is not a case where the government engineered and directed the criminal enterprise

---

[16] It is noted that the Defendants did not report the "theft" until approximately eight (8) weeks after the seizure, and were vague and evasive when asked about what had been "stolen." For example, when Post Falls Police Officer Mattson spoke to Steven Randock by telephone on May 26, 2005, and asked him if he had any names or numbers that would help identify the files which had been taken, Mattson reported that Randock did not provide any information in that regard. (Mattson Report, Ct. Rec. 342-2 at p. 16). Mattson's testimony at the evidentiary hearing was consistent with her report.

On May 31, 2005, when Detective Tafoya asked Dixie Randock what it was that AEIT actually did, she stated it was an on-line document processing center primarily for schools located outside the United States. According to Tafoya, when he asked to what exact schools she was referring, Randock would not name any specific school. And while Randock mentioned that the entity "OTAC" (Official Archive Transcript Center) was somehow attached to Suite 8B, Detective Tafoya says she would not elaborate on what "OTAC" stood for or what its function was. (Secret Service Report Of Investigation (ROI), Ct. Rec. 342-2 at p. 21). Detective Tafoya's testimony at the evidentiary hearing was consistent with the information contained in the ROI.

**ORDER DENYING MOTIONS
TO SUPPRESS AND DISMISS -    23**

from start to finish and/or where the police employed physical or psychological coercion against the Defendants.  Instead, law enforcement resorted to deception which, for reasons discussed above, this court does not deem "outrageous."  The government's conduct was not so excessive, flagrant, scandalous, intolerable, and offensive as to violate due process.[17]

Assuming for the sake of argument that Defendants' conduct crossed the line and was "outrageous," this court would not find that conduct so egregious as to warrant dismissal of the Indictment against Defendants.  Instead, the remedy would be suppression of whatever incriminating information or evidence was obtained by Detectives Beck and Tafoya during their May 31 visit to Suite 8B and during their follow-up visit with Markishtum on June 6.  It is not apparent, however, that Markishtum or the Randocks made any incriminating statements during these visits.  As discussed *supra* (n. 16 at pp. 22-23), the Defendants gave, at best, vague and evasive statements regarding the nature of the business being conducted out of Suite 8B.

Brief mention of the visits by Beck and Tafoya to Suite 8B is found in the affidavits that were submitted in support of the search warrants that were issued and executed on August 11, 2005.  (Paragraphs 117-118 of Neirinckx Affidavit, Ex. 5 to Ct. Rec. 361; Paragraphs 111-112 of Nierinckx Affidavit, Ex. 7 to Ct. Rec. 361; Paragraphs 117-118 of the Neirinckx Affidavit, Ex. 8 to Ct. Rec. 361).  The paragraphs contained in each of these affidavits are identical as to the

---

[17]There was no violation of the Fifth Amendment right against self-incrimination since none of the Defendants were in "custody" when they were interviewed by Detectives Beck and Tafoya.  *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc).  There was also no violation of the Sixth Amendment right to counsel since formal adversary proceedings had not been initiated against the Defendants at the time these interviews took place.  *McNeil v. Wisconsin*, 501 U.S. 171, 175-76, 111 S.Ct. 2204 (1991).

**ORDER DENYING MOTIONS**
**TO SUPPRESS AND DISMISS -    24**

information contained therein.  None of that information pertains to statements allegedly made by any of the Defendants during the May 31 and June 6, 2005 visits, or to any documents or seals provided by Defendants to Beck and Tafoya during those visits (listed at p. 639 of Ex. 9 to Ct. Rec. 361) .[18]  Even if these few paragraphs were excised from the respective affidavits, there would still have been probable cause for issuance of the warrants based on the remaining detailed information found in the lengthy affidavits, each comprised of over one hundred paragraphs and pages.  This remaining information was derived from sources other than Beck and Tafoya and their May 31 and June 6, 2005 visits to Suite 8B.

During oral argument, Defendants' counsel argued that what the Secret Service got from their visit to Suite 8B on May 31, 2005 was an informant in the person of Amy Hensley.  Hensley was named as a Defendant in the Indictment, but pursuant to a plea agreement, has pled guilty to Count 1and is currently awaiting sentencing.  Hensley testified that at her June 8, 2005 meeting with Detective Tafoya, he told her that he thought she was the one who had taken the boxes to cover up financial wrongdoing of which she had been accused by Steven and

///

///

///

///

///

///

///

[18]  The court does not find credible the assertions by the Defendants that once inside the interior of Suite 8B, Detectives Beck and Tafoya, without permission from Defendants, rifled through drawers and file cabinets in search of particular documents or items.

**ORDER DENYING MOTIONS**
**TO SUPPRESS AND DISMISS -    25**

Dixie Randock.[19]  Detective Tafoya testified that he did suggest to Hensley that she was responsible for taking the boxes.  Hensley denied taking the boxes.  A review of the affidavits tendered in support of the search warrants subsequently issued and executed does not reveal that any information obtained from Hensley by Tafoya on June 8 was used to procure any of those warrants.

According to Hensley, the next time she met with Tafoya was on August 11, 2005, when he confronted her with the "diploma mill" allegations and urged her to cooperate or risk going to prison.[20]  Hensley testified that Tafoya asked her to call Dixie and Steven Randock and she did so.  According to testimony from Tafoya, during Hensley's telephone conversation with Dixie Randock. Mrs. Randock simply denied that the Randocks were operating a "diploma mill."  According to Hensley, Steven Randock essentially said nothing during his conversation with her, and moreover, his end of the conversation was not recorded.  Detective Tafoya only heard Hensley's end of her conversation with Mr. Randock.  In sum, there is no indication that any incriminating information was obtained from the Randocks during these calls.  Furthermore, Hensley has pled guilty, has agreed to assist the government in this case, and has waived any argument that she was coerced to assist the government in its investigation, or was otherwise the victim

---

[19] Detective Tafoya testified that he asked the Randocks on May 31 whether they had any disgruntled employees who might be responsible for the "theft" of the boxes.  Agent Neirinckx testified that the Secret Service ROI showed that in response to that query, Dixie Randock identified Hensley as someone who had caused financial losses for the businesses owned and operated by the Randocks. The Randocks also volunteered information that there had been a significant discrepancy between checks that were written by Hensley and when those checks had cleared the bank.

[20]  August 11 is the same day search warrants were executed for the seven different locations mentioned in the "Background" section of this order at p. 4.

**ORDER DENYING MOTIONS**
**TO SUPPRESS AND DISMISS -    26**

of any "outrageous" conduct by the government.  In any event, the testimony of Internal Revenue Service (IRS)Agent Janet Tompkins who was present with Detective Tafoya during the August 11, 2005 meeting with Hensley, convincingly rebuts any inference that Hensley was coerced into doing anything.

In sum, if there were "outrageous" conduct warranting suppression, it appears there would be nothing of any consequence to be suppressed.

## III.  CONCLUSION

For the reasons set forth above, the Defendants' Motion To Suppress Evidence (Ct. Rec. 328) and Motion To Dismiss Indictment, Or Alternatively, Suppress Evidence (Ct. Rec. 342) are **DENIED**.

**IT IS SO ORDERED**.  The District Court Executive is directed to enter this order and forward copies to counsel.

**DATED** this   1st   day of February, 2008.

*s/Lonny R. Suko*
_____
LONNY R. SUKO
United States District Judge

**ORDER DENYING MOTIONS
TO SUPPRESS AND DISMISS -    27**